Good morning, Your Honors. Rebecca Fish, Federal Defenders of San Diego, representing Herminio Garcia-Carillo. Mr. Garcia asked for a simple procedural safeguard to ensure that no member of the jury convicted him based on prejudice against Mexican immigrants, against people like him. And indeed, in this case, there was at least a reasonable possibility that such prejudice would influence the jury for three reasons. First, the climate in the community. There were widespread negative stereotypes about Mexican immigrants in the community at the time. Can I ask you, does your argument, sorry to cut you off before you get to all three, but just on that first one, does your argument depend, is it temporally limited in the sense, or is your position that every single illegal reentry defendant in the Southern District of California, from basically the moment President Trump was elected on, until I guess what, he leaves office, maybe forever, is entitled to have this kind of question asked? Or is there something special about that moment in time right after the election that you're focused on? What's your position on that front? Your Honor, my position is that it's both the time and the specific facts of Mr. Garcia's case that required such voir dire here. I do not believe that every single reentry case, nor every single reentry case under the Trump administration, necessarily requires such voir dire. Okay, so what's special about your client's case? So the first is, are the widespread negative stereotypes. And the second are the facts of Mr. Garcia's defense. And these were known to the district court prior to trial. He acknowledged at ER 23 through 26, reading Mr. Garcia's ex parte proffer, delineating his defense. Mr. Garcia took the stand in his own defense, and necessarily in doing so, admitted that he was a Mexican national, that he had a prior felony conviction, and that he'd previously been deported. But isn't this going to be almost every illegal reentry? Your Honor, no. Frequently, clients do not take the stand in such cases, and frequently prior felony convictions are not brought out of individuals charged with reentry. This was clear from the district court's in limine rulings, as well as Mr. Garcia's ex parte proffer, that this evidence would come before the district court. And so those facts that were sure to come out at trial, played directly into the negative stereotypes widespread in the community at the time. I don't see how your argument here can turn on the fact that your client was going to admit that he had been convicted of a prior felony. That's the very stereotype that your client's defendants in your client's position would be concerned about, whether they admitted the conviction or not, right? So I think your argument can't be confined just to the unique facts of this case. I think what I'm interested in maybe is just in hearing more, going back to the temporal question. So let's assume that we were to credit your argument for purposes of this case. Does that mean then that all of these stereotypes that your client was concerned about, they're still out there. Why wouldn't a defendant today, every defendant today, from here on out, be concerned about those? Certainly, Your Honor. And as this court and the Supreme Court and Rosales have made clear, it's a case-by-case inquiry. So the Supreme Court has been careful to stray away from bright-line rules that X case always requires this voir dire. And I think typically, as cited in my reply, courts do allow voir dire interracial prejudice in these cases. I do believe that the facts here are important because not only were these stereotypes present, but Mr. Garcia was going to admit that some of the facts were true about him. And so I think he was very concerned that members of the jury in this border district at this particular time when Mexican immigrants were being decried as criminals and rapists and murderers, that they would think that was him. And they would say, I don't care what the law says. I don't want you in my country, and I'm going to convict you. And they would not impartially follow the jury instruction. And that was a concern here. For a defendant, say, raising a different defense, an official prior conviction may not come up. It's less likely that a juror would necessarily assume that about that person if they hadn't heard it, or would necessarily have the... Would your rule basically be any defendant who is going to testify then? I guess I'm not clear the boundaries of the rule still. The more you talk, I'm still not clear on it because I think whether he has the conviction or not, I think the fear is that people will assume he does. So that sort of washes out. And so then maybe the issue is they have to deal with the problem, or where's the boundary? Certainly, Your Honor. And I'm not asking this court to define a new rule. I'm asking this court to apply the rule in Rosales. And that rule is simply, if there's a reasonable possibility that racial or ethnic prejudice would influence the jury, the district court's denial of a request for voir dire into that issue is reversible error. And the problem is, I don't know how we cannot have a rule if we rule for you, because it seems like there are a lot of legal reentry cases with Mexican people coming in, and I don't see how we avoid adopting a rule. Certainly, Your Honor. And this court, in some sense, has already weighed in on this issue in the context of Batson and Esparza. This court held that race is necessarily implicated in an illegal reentry prosecution where the defendant is a Mexican national. So this court has somewhat already weighed in on that issue. I'm not asking this court to write such a bright-line rule here. And this court and the Supreme Court have held this to be a totality of the circumstances, case-by-case inquiry. And I think that Mr. Garcia's case meets that standard here. At least there was a reasonable possibility race would have influenced the jury. Nothing unique about your client's case, I think, from the standpoint of the argument you're making, other than maybe the timing of when the trial occurred? And that's why I was trying to tease out if you're placing a lot of weight on that, or does that just not matter in the analysis at the end of the day? I do place weight on the timing, Your Honor. So I do agree. So why is the timing critical, then? The timing is critical, Your Honor, because of what was portrayed about people, about Mexican immigrants specifically, in the community at the time of Mr. Garcia's trial. You're trying to say the timing or the special circumstances under Rosales Lopez? Correct, Your Honor. Both Rosales and Sarkeesian, this court's case, have been known. I mean, but, you know, I hate to say it, but President Trump made inflammatory comments about people from a lot of other nations at different times. I mean, is that same rule going to apply to anybody who tries to enter the country illegally? Your Honor, I think to the extent that it's clear that there's prejudice in the community against a person charged with illegal re-entries, ethnicity or nationality, and those facts are going to be central to that person's trial, there is at least a reasonable possibility. But how is it central to the trial when, in this case, your client, Mr. Garcia, this is an illegal re-entry case? He merely crossed the border when he was not permitted to cross the border. The same law applies no matter where you're from. I just don't understand how you can create special circumstances out of this. Correct, Your Honor. Well, I do think the special circumstances exist, and external circumstances may be considered, as this Court has recognized in Sarkeesian and the Supreme Court recognized in Rosales. And the external circumstances here were that specifically Mexican immigrants crossing the southern land border had been decried as criminals, and there was a concern that some... Well, even if they weren't decried as criminals, this was his fourth trip, at least, to cross the border illegally. That's what he's charged with. It doesn't matter who he is or where he came from. Well, and, Your Honor, I believe the concern here is that the facts of his case and the prejudice that was known in the community made clear to the District Court prior to trial raised at least the reasonable possibility that someone on the juror might act on prejudice against Mr. Garcia, against people of his nationality and ethnicity, rather than act on the law. And that is the concern at issue here. That is the rule that Rosales developed to ensure that that doesn't happen, that that's a miscarriage of justice. And I think here there was at least that reasonable possibility. And the timing, the external circumstances, the fact that this was not only... These were not only stereotypes that were in the community, they were loudly proclaimed in the news at that time. They were central. And they may occur again. There may be other times in history when such stereotypes are loudly proclaimed, and if those are made known to the District Court prior to trial, and race or ethnicity of the defendant is, as here, an element of the charge against him, facts that could play into those stereotypes are going to be shown at trial. I think in those cases as well, there would be a reasonable possibility that racial or ethnic prejudice would influence the jury. So I'm a little confused about how you think this should work, if you win, because you did ask, don't cover this racial bias concern. But then one of the questions that you wanted to be asked is, do the jurors believe that a wall should be built? Which seems to me to be a question about immigration policy and not racial bias, really. Can you explain? Yes, Your Honor. I would note that at ER 7 and 8, the first question I proposed was directly about prejudice against Mexican nationals and immigrants. Acknowledging the broad discretion District Courts have in this area, I raised my concern very clearly that people would be prejudiced against Mr. Garcia as a Mexican immigrant, an undocumented Mexican immigrant. I proposed either Attorney Conductive Voidier or a series of questions. But what were we supposed to make of this question about whether a wall should be built between the U.S. and Mexico? Your Honor, this was a border district. Mr. Garcia was accused of entering through the hills, and I believe that that was one of multiple questions proposed to get at concerns that Mexican immigrants need to be kept out of this country. And to Your Honor's greater question, whether the Court's questioning about immigration laws generally was sufficient, I don't believe so, Your Honor. Because that asked about laws, not about people. And the concern here was people. I would, if possible, like to reserve the remainder of my time for rebuttal unless the Court has other questions. Of course. We'll give you some time for rebuttal. Let's hear from the government. Thank you, Your Honor. Thank you. Welcome back. Good morning again. O.J. Krishnamoorthy for the United States. So let me ask you this, just straight out of the box. Could then, let's say that then candidate Trump had been seated and, you know, been called as a prospective juror in this case. And so everybody, we all knew what his campaign statements had been. Do you agree that he would be subject to a strike for cause in this kind of case? I think it would depend on what he said during... No, no. I'm saying we know what he said. So take it as a given, everything he said on the campaign trail, right? Right before the election, he's called as a prospective juror and he actually showed up. And the defense counsel moved to strike him for cause. It's a meritorious strike, I assume. Regardless of what he said before, I think it would depend on what he said in response to the district court's questions during Vordir. So in this case, the district court opened Vordir by saying that this was an immigration case, that Mr. Garcia was charged with not being a U.S. national and asked if anyone had strong feelings that would preclude them in immigration cases from applying the law fairly and accurately. And I say that I think, you know, I don't have memorized all the statements, but I think we all know what they are. They're very derogatory about Mexican nationals as a... In terms of the folks who crossed the border illegally, they're very derogatory. They're based on if, I mean, I got to be honest with you, if I'm a district judge and somebody espouses those views and then says, oh, but I can be fair and impartial against someone who's accused of coming from Mexico illegally, I don't think I would be persuaded. So, OK, but you think somehow that the person could be rehabilitated. Well, defense attorneys are, of course, entitled to make credibility determinations during that Vordir. And I'll confess that if I were a defense attorney, there may be things outside the context that would give me pause. OK, you would at least want to know that somebody had those views, maybe even just in terms of deciding whether to exercise your peremptories. Right. That's part of the reason for Vordir. So the reason I start with that question is that it seems to me our cases and whatever that last Supreme Court case was, the name always escapes me, Rosales-Lopez. Thank you. They're just saying we want the prospect that prejudice might be in play amongst the veneer persons to be somewhat above the speculative level. Right. There's got to be a reasonable possibility. It's not not a probability, just something above the level of of speculativeness. And so I guess I understand the defense's argument here. There's a very prominent public official who has espoused views that I think would be disqualifying to sit on a case of this nature. And so why? And it's not like that person ran a very prominent political campaign and garnered no support. Everyone just said those views are hateful and we reject them. And the person's at, you know, point zero five percent in the polls. The president won the election, grounded in large part on on his position as to immigrants coming illegally from Mexico. So why is there not a reasonable possibility that one or more of the veneer persons called might might share similar similar views about Mexican immigrants? That doesn't strike me as a speculative or crazy notion at all. So help me with that. So I'll agree that the language used in Rosales-Lopez is reasonable possibility. I disagree, however, that it is something that is barely more than speculation. And I'll go back to the only three cases of which I'm aware in which courts have said that inquiry into racial prejudices are required. Those are the Supreme Court's decision in Ham, Aldridge and Rustano. In Ham, there is a specific allegation that the defendant was framed on account of his race and both Aldridge and Rustano involved circumstances of violence between races. And so all those cases, I'm not saying that those are the only circumstances, but it is significant to me that all those turn on on facts, specific circumstances that are specific to the circumstance of the case. OK, but hang on. So your position is that no, no circumstances external to the crime itself can be factored into this reasonable possibility. No, Your Honor, that's not my position. Then forget about what you just said and focus back on my question. OK, so so I'll grant you that it's it's got to be more than you want to say. It's significantly above the level of speculation, whatever you want to call it. It's reasonable possibility. OK, why isn't it reasonably possible that one or more of the veneer persons called for this defendant's jury might well have shared views similar to those espoused by then candidate Trump? I think that the voir dire that the district court actually conducted is significant and it was very similar to the one that was approved in Resolves Lopez. You're talking about the question about immigration laws? Correct. OK, let's say I don't I'm not persuaded by that because I'm not. So just come back to my question. OK, a very prominent public official has run on a campaign that has espoused certain views. He's garnered enough support to win the election. Veneers called for this person's trial shortly after the election. Why is there not a reasonable possibility that one or more of those people might in fact hold the same views as the candidate? Your Honor, I am going back to that immigration was conducted because that was given almost dispositive significance in Resolves Lopez. So with respect to the reason I think you're wrong there is that the judge actually asked about prejudice against aliens and the court was willing to accept that as encompassing prejudice against illegal immigrants from Mexico. Here, the question poses strictly. It's more like a policy argument. And actually, I'll just tell you the language that gives me zero comfort. Basically, the question is put more generally. So some people have very strong feelings about the immigration law and they feel so strongly that they can't follow existing law as basically as I as the court. I'm going to give it to you. I don't think that in any way captures the concern that the defendant here is worried about. I don't think the district court's inquiry was quite that surgical. I agree. That's what the district court said at the very beginning. But at various points when he was engaging the other jurors, he referred alternatively to immigration law, immigration enforcement, or just immigration. And the jury never says, are you biased against Mexicans, right? No, he does not. But at the beginning of word here, he also acknowledged that this was a case involving someone who is charged with being a national of another country. And so I think in the context of immigration, jurors could only understood this case will involve someone involved. It will involve someone who's charged with being a national of another country. And that question about their president's statements were specifically about Mexicans. And how does that help us? Maybe he was from Costa Rica as far as the jury knew at that point. Your Honor, I think someone, I think the, the voir dire into whether or not you can be fair and impartial as someone from another nationality necessarily encompasses someone who is specifically Mexican or Costa Rican or whatever, whatever, whatever other country there is. And I think results, Lopez does make that point. Um, but your, your position, as I understand it, you have basically just said, we're, we're either going to be persuaded that, um, the question posed by the district court here covered the subject. I think that's the language that alterage or those other cases use. Um, we're either persuaded by that or, or you lose. That's, that's what I hear you saying. No, Your Honor. I, although I do, I do think that's significant, but it's also say you got besides that, because as I said, I'm not persuaded by that in the least. The other discretion that district courts have in this regard, because they're sitting in front of the jurors, they're allowed to make credibility determinations as are the attorneys. And with the fourth circuits on bonk decision and Barbara explained is that there are costs on the other side of allowing specific voir dire questions, interracial biases. The first is taking that discretion away from the district court and mandating something that the district court may not see as necessary. And the second is the potential of diverting the jurors attention to race where it may not have been otherwise. And as a result, that's why district courts have the discretion to ask the questions that they see fit and to make those determinations on the ground. Um, I see that I'm almost out of time unless the court has any other questions. Thank you. Okay. Let's hear from the defense council, you know, a minute. Yes. Thanks. Thank you, Your Honor. Responding first to the government's last point, I would note that in both Rosales and Aldridge, the Supreme Court held that it's far more injurious to allow a member of the jury who may act on prejudice based on race or race or ethnicity to sit on a jury than it is to raise that prospect before the jury. And Rosales has indicated that generally district courts should allow this when the defendant asked for it, even when there's not a reasonable possibility, um, that such prejudice would influence the jerk, the jury. And to your honor's question about the district court's question posed on immigration laws. I agree. It's perfectly possible for a person to say, I have no problem with the immigration laws. I'm very happy to keep out those people I don't like. Or to say, I agree. I have no problem with the immigration laws. I'm very happy that they protect these people I have great sympathy for. That question gives us no insight into whether or not that person holds bias against my client. And again, here at the court never mentioned Mexican nationality and the facts are highly distinguishable from Rosales where the defendant was not actually charged as the, the, um, undocumented immigrant himself, but was rather charged with alien smuggling and did not testify. Um, I do believe that there was at least a reasonable possibility here based on not only the centrality of my client's nationality and lack of immigration documents to the charge, but the specific facts of his case and the very clear, um, indication that there was such prejudice against Mexican immigrants specifically in the community at the time. The evidence of the bias in the community is the election and then voting results. How many people voted for president Trump? What's, what's the evidence of that bias? Certainly, your honor. I had cited, um, at year seven and eight, um, a couple of examples of statements made broadly, um, both by then president elect Trump and, um, other times that for example, victims of people killed by illegal or undocumented immigrants had been, uh, called to speak at large public events. Um, and certainly the election and its results were well known. Um, so I think there was plenty of evidence in the record and I raised the concern quite plainly that I think there are people out there in the community who hold strong bias against Mexican immigrants and I want to ensure that none of them are sitting on the jury. I'm just trying to understand like the community. I mean, is the community here our whole country or is there something about San Diego? Do we need to have speeches in San Diego by people from San Diego? What do we need to have for this evidence? Certainly, your honor. I don't think it has to be as narrow as to San Diego. The San Diego is a border district that voted, uh, you know, I think slightly under 50% did vote for president than president elect Trump. Um, under with these statements in the public and further as in Aldridge, which occurred in Washington DC in 1931, the court noted that it may not be the majority view in the community that people are biased against African Americans, but as long as some people in the community hold that view, it's important for us to suss it out and ensure that no one who's not going to act fairly sits on this jury. So I don't think it has to be the majority of the community that holds a prejudicial view. It needs to be the whole country. Uh, here, um, here, I think that it was a danger throughout the country. It's especially acute in a border district like San Diego where these issues are literally in the backyards of our potential jurors. Okay. Thank you very much. The case just argued will be submitted.
judges: Fisher, Watford, Friedland